In this case, it's number 2011-1169, Secure Controls against Vanguard Products. Mr. Gerstle. Thank you, Your Honors. Good morning, Your Honors. To begin, I'd just like to say, Your Honors, we understand that the claim of inequitable conduct has been over-pled, and it has been a plague on the system. We've never brought a claim for inequitable conduct. But there is still a time and a place for inequitable conduct claim. This is such a case. Why? Two reasons. First and foremost was the reissue declaration, which was just false. That's, in our opinion, the biggest reason. It was just not true, which led the examiner down a totally wrong path for the intent to control an entire industry. Your patent is invalid? Yes. So why are we here? Yeah. It's a good question. I didn't think to ask it. Why don't you answer it for us? The reason why we're here, Your Honor, is the defendants that prevailed spent a lot of money and time in defending a lawsuit that should have never been brought. Not only time and the money, but the concern that their companies wouldn't be in existence. And when a competitor does that on a patent that was wrongfully obtained through a false reissue declaration and not disclosing prior art, they should be held accountable to it. And the defendants that were forced to defend that lawsuit should have the opportunity to be reimbursed for its fees that it had to pay through litigation, which should never have been incurred. It was a lot of money. It was a lot of time. So this is all about supporting a claim for attorney's fees? Yes, at this point, Your Honor, because the patent has been invalidated. Attorney's fees are substantial. Too young. And growing all the time. No. Relatively speaking, a lot less than it would be in other places. Especially in this case, Your Honor, when Vanguard was the new company on the block, the fees that incurred were, it hurt them a lot. They were significant. Where is Vanguard now? Are they still operating? Yes. Yes, Vanguard is still operating. And they're doing well. And Telefonics is still operating. They're doing well. But it still doesn't change the fact that, but for invalidating the 590 patent, this case was a real threat to them, to the existence of their two companies. What did trial court do wrong? Two things, Your Honor. Committed error. Under our current law. Yes. Under the Theracents law. Please. One, with regard to the reissued declaration, it specifically stated that the declaration did not preclude the fact that Mr. Layden and Mr. Surma found the Burke Pryor patents in May of 1996, when the 771 application was still pending. That's clearly erroneous. Because when the inventors submit a declaration detailing when, who, and how the Burke Pryor patents were found in paragraph 11b, that is precluding the truth from being said, from being discovered. When they tell the examiner that the inventors found, understood the manufacturer of this electronic recoiler to make the GTE, a manufacturer for GTE, and they find this GTE patent, 960 patent. And then they give this 960 patent to their patent lawyer, who then does his own search and finds the Burke Pryor patents. And all this occurred after the 771 patent issue. That does, when an examiner reads that, that does preclude the examiner from thinking, from knowing that, well, the inventors really found the Burke Pryor patents, because those Pryor patent numbers were on a label on an electronic recoiler in a security system in May of 1996, which was also in the brochure of Protex in May of 1995. So the fact that the affidavits don't say that the examiner did not find this in May of 1996, it does preclude anyone from thinking that the inventors knew about the Burke Pryor patents in May of 1996. The only reading of the reissued declaration is that the attorney, patent attorney, discovered the Burke Pryor patents after the 771 patent issued. And they went to sue telephonics. And that is just not what happened. And the examiner relied on those statements. And the two other statements in the reissued declaration, which are just as bad as in paragraph 9 in 11a, when the inventors say, we knew about Pryor electronic recoilers for telephones all along. We just didn't know that they could be used in security systems. So therefore, we didn't think about telling you. Well, that was not true. In May of 1996, when the 771 patent was still pending, they saw the telephonic electronic recoiler in a security system. Tell me again what the trial judge did wrong, specifically, other than he didn't hold for you. What else did he do wrong? I mean, you're reciting all the facts. What he did wrong was our court tends to read briefs. And we're pretty familiar with your facts. So you don't really have to repeat them to us. But tell me exactly what the trial judge failed to do that you think was an irreversible error. He ignored all of the, first of all, he held that the reissued declaration did not preclude the fact that the inventors discovered the Burk-Priort patents were in security in May of 1996. The reissued declaration does preclude that. That's a legal error? That's clearly erroneous, yes. Factually erroneous or legal error? That's legal error. What's the law? The law requires him to hold otherwise? I'm sorry, that's factually error, Your Honor. That's factually error. You disagree with his fact-finding? It's clearly erroneous, to the degree that it's clearly erroneous that the only inference is that the inventors, that the reissued declaration does preclude that, that the inventors discovered the Burk-Priort patents in May of 1996. The other error is ignoring all of the evidence, regarding the intent and the withholding of the Burk-Priort patents. When you say he ignored the evidence, you mean he didn't read or stay awake during the argument, or you don't think he waited correctly? I don't think he even considered it, and therefore did not wait. It's not stated anywhere in the opinion. I have no problem with the district court finding that there was no clear and convincing evidence of intent, if all of the evidence is considered and at least explained with this evidence. Well, now wait, those are two different ideas. One is considered, the other is explained. Are you saying that he has to discuss every piece of evidence? No, he doesn't have to discuss it, but he does not have to discuss it, Your Honor. However, I think it's clear he did not consider it. Why is it clear he did not consider it? He was not aware of it. Why is that clear? It's clear because if he did consider it. He would have come out the other way. We all know that. The only reasonable inference is that there was intent. I think that's what the clearly erroneous standard is, is that if you look at all the evidence, there is sense that has to do. If the only inference is intent, the only inference has to be intent. And that's why we believe it's erroneous. Maybe we're too close to it, Your Honor. Maybe we've been living too long with it. I'm hearing you. I'm just trying to understand exactly what your case is about. I'm having a little difficulty. I'm slow. You'll have to work with me. OK, let me rephrase this. The clearly erroneous standard, it's not unfettered discretion at the trial court. There's a standard that if he was committed clear error. That's a pretty high standard. Agreed. He has to have compelling evidence that it rained, and he said, oh, the sun was out. And compelling evidence is when the inventors see the recoiler at issue in the security system with patent numbers on that recoiler, and then do the patent search to get it, and then go sue the man whose prior art it is that's in the security system to say that. But the explanation, according to the record, was that they figured it had to do with telephones, and they weren't dealing with telephones, so they threw it in the file. Now, if you and I were having a beer to discuss this case, we might think that's a pretty thin argument on their part. We might think that. But I don't know. You're trying to tell me that that's totally no reasonable judge could have come out there. I think that's right. I don't think. I think the only inference, which is the only. Did he hear the witnesses? He did hear the witnesses. At length? How long did this trial go on? It was two days separated. Two days, Your Honor. Yeah. Right. He heard the witnesses, and he assessed their credibility. But I knew these questions were coming. And your answer is? I'll say it again. When you see the patent numbers on the product in the security system, and then if it was really true, why didn't the reissue declaration say that? Why did it make up this other story that that's our position? Thank you. Thank you, Mr. Mercer. Good afternoon, Your Honors. May it please the court. I'm Richard Harris. I'm with Greenberg Traurig, and I represent SECURE. At the very outset, the first representation that was made to the court on argument just now was the fact that the most egregious act of inequitable conduct supposedly has to do with this reissue declaration. Yet at page one of defendant's reply brief, they withdrew the act of inequitable conduct based on the reissue declaration. It's expressly in there right in the middle of the page, at page one. So now it's being reasserted again after it was withdrawn. That said, Your Honor. They withdrew it with the explanation that, given thorough sense, it really wasn't the big issue. They moved to the second issue. True, but now it's the primary issue. Well, that may have been my fault. I sort of focused him on that. OK. He played, perhaps, too long about that. That said, Your Honor, if I could just give a feel to the court of exactly how this trial progressed. The trial itself, the in-court portion, excluding the court's separate viewing of video depositions, approximately eight to 10 hours of that, which, by the way, he confirmed he watched separately apart from the trial. The trial itself took two days. It approximated 500 pages of transcript through six witnesses via either deposition and or direct testimony, live testimony in court. During the actual conducting of the trial, the court went above and beyond and asked questions of the witnesses and asked questions during both opening statement and closing argument of the attorneys, focusing in on as much information as he can consume. This is what the court did. After that, the court, under a lesser standard, pre-thorough sense, went ahead and confirmed that not only was there a failure to prove an awareness of the materiality, but that, under the older standard, there was a failure to show that they should have appreciated the materiality. There was additionally a finding by the court that there was absolutely no deliberately withheld information from the US Patent and Trademark Office. And after this decision, that particular court retired, and the case was assumed by yet another district judge who reported on the record that he had reviewed the findings and found them compelling. Now, we heard just very briefly, and in the appeal briefing to the court, we hear reference to this purported made occurrence of finding a label on a product and scraping it off. There's 13 references to it in the briefing, 13 references. They all refer back to joint appendix page 70, where Mr. Layden, one of the inventors, says, indeed, there did come a point in time where he scraped off a label, and he saw a patent number. And he went ahead and took it to his patent attorney. The problem is that joint appendix page 69, where he testifies that that was in November or December of 1996 after the 771 patent issue, and also, again, at joint appendix page 71, both at 69 and 71, the dates appear. But those dates are not mentioned, because the timeline is being revised here. And that was never presented to the court. Didn't they, in their reply brief, say that all that happened in July? No, they say that that happened in May, while the actual testimony was that it occurred in November or December. Now, that was never raised with the court, and for good reason, because at two locations in the court's was very familiar with the nature of the search report results from the search that actually was taken in May, which had nothing to do with a label being peeled off of anything. That had to do with the fact that Mr. Burke, in a telephone conversation, says, I've got patents. And the court was aware of the fact that a search was conducted where five patents came up. It was a patentee search looking for the name Burke. And of the five patents, three of those patents were in someone else, some different Paul Burke from Rhode Island. It was a patentee search. There's a suggestion here that they peeled off a label that had patent numbers on it. Why would they be taking a patentee search to see what the patent numbers are, if they had a label with the patent numbers on it? So that argument, trying to reorient  simply was not presented to the court. It's being presented to you, Your Honors, for the very first time in the briefing in this case. The record supports that argument. The facts are there. Right. He had the facts. But the argument that it occurred in May didn't occur at the trial. It was made in the summary judgment briefing. There were briefs back and forth even before the trial. But that argument was dropped during the actual trial. It was never presented. The only testimony on dates was that it was never even argued. Now, with regard to going out for that glass of beer, Your Honor, where we discussed the things that were going through Mr. Layden's head, the motivations, as the court explained, which the court was satisfied came from a credible witness and were reasonable. It wasn't just simply that they referred to telephones, recoilers for telephones that had to be near a telephone jack so that someone could listen to a telephone. It goes well beyond that. It goes to the fact that, first of all, the inventors who were looking at these abstracts and these printouts from this search, the one that was conducted in May of 1996, they only had text. There were no drawings so that you could picture what is being talked about. It did come up referring to telephones only. There's references in there to ratchets that when you pull on this telephone recoiling device, it initially locks so that you could talk on the phone without having to struggle with the recoiler. And then when you pull it again, it retracts. That's the antithesis of how a security device works. But then again, he didn't have the picture to see it anyways. These are individuals. Mr. Layden flunked out of high school. And his co-inventor did finish high school with one year of technical school thereafter. Mr. Layden recalls that he did. He remembers reading some parts of it and discussing it. But in terms of his ability to understand and comprehend exactly what was in there and the significance of it, this is a gentleman who has consumed more with the fact that two years earlier, he had filed a patent application and had introduced a product that was very important to him and it was selling well. He was concerned whether or not he's being accused of infringement of a phone recoiler for a telephone handset. That was his primary concern. His own attorney, who, by the way, was subpoenaed, was testified at trial, had severe concerns, significant concerns about the relevance of that particular reference. This is pre-KSR days, remember. And in fact, the examiner issued the 590 patent over that reference. So the but-for test doesn't exist here. In essence, the inventors were being held to a standard of awareness of materiality and intent. They're being held to a higher standard than that of their own patent attorney and the examiner, who deemed it non-analogous art. They too, the inventors, deemed it non-analogous art. So in essence, when we get to the point, I don't want to rehash all the remaining facts with the court. The fact of the matter is, yes, we all know why we're here today. But stripped of its vitriol, stripped of the reorientation of timelines, and what truly happened here, a first judge, a first court, being fully apprised, with the words, fully apprised in the premises of what each side was contending here, sat back, asked questions, listened carefully, and made a ruling. And made a ruling based on all the evidence, the consideration of all the evidence, including a review of all the videographed depositions. He found plaintiff's witnesses to be credible. He found that, even under the old standard, that it didn't even approach their should-have-been-aware standard that preceded Theracet's. For that reason, Your Honors, stripped of all the vitriol, stripped of all the reconfiguration of the facts here, the fact of the matter is, plaintiff prevailed at this trial. And it was only after due consideration by a court that was re-reviewed by yet another judge and felt to be compelling. We believe that the decision should be affirmed. Thank you. Before you sit down, Mr. Harris, may I ask a further question? Sure. On the subject of vitriol, I realize that Chicago has different standards for argumentation, perhaps, than some other parts of the country. But these two briefs border on the edge of excess. Yours, I think, is the worst. For example, on page two of your brief, you say, C. Cure does not agree with appellant's statement of facts. Appellants misstate and omit key facts. That is your brief, isn't it? The red brief, page two? Yes, that's correct, Your Honor. First line of the statement. Appellants misstate and omit key facts or unable to support alleged facts with citations to the record. And that part, I think, is true. And present purported facts that were neither presented nor argued to the district court. Indeed, appellants assert facts that are directly contradicted by the record and which they know are incorrect. That's a serious charge, Mr. Harris. That's a direct charge that they are trying to mislead this court. And I assume that you have taken this up with the proper state authorities with regard to their license. Have you? I have not, Your Honor. I can tell you why that sentence appears to me. Don't you have an obligation, if you think they are deliberately misleading this court, to take that charge to the proper authorities? Or is it a little bit strong? Perhaps it could have been worded a little less strong. But that particular sentence refers to the recharacterization of time and the attempt to carefully focus in on one page of transcript and suggest that a search that did not occur in May of 1996 did occur. I don't disagree that they state strongly the facts as they want us to view them. But to charge them with asserting facts that are directly contradicted by the record in which they know are incorrect is a serious charge. If you're going to make a charge like that before a federal court, you need to be prepared to take that charge to the proper authorities and have them disbarred. I don't think you mean that. I don't, Your Honor. May I suggest in the future you don't make those kinds of charges unless you do mean them? I completely understand the court's perspective on that. And I can tell the court that I will certainly be more careful in that regard. That's not what I intended to suggest, Your Honor, that it was subject to disciplinary. You may take that as an apology, I believe. Thank you. I will even pose it as a formal apology, Your Honor. That's not what was intended. Thank you, counsel, for your understanding. Thank you, Your Honor. Are there any other questions that I could perhaps answer? No questions for your son. Thank you, Your Honor. OK, the case is taken under submission. Thank you, Mr. Harris and Mr. Grossman. That concludes the argument cases for this session.